1

2

3

4

5

6                          **UNITED STATES DISTRICT COURT**

7                          EASTERN DISTRICT OF CALIFORNIA

8

9    PATRICIA IRENE PERRY,                    Case No. 1:14-cv-00825-SMS

10              Plaintiff,

11        v.                                   ORDER REVERSING AND REMANDING
                                              AGENCY'S DENIAL OF BENEFITS
12   CAROLYN W. COLVIN, Acting
     Commissioner of Social Security,
13
                Defendant.
14

15          Plaintiff Patricia Irene Perry seeks review of a final decision of the Commissioner of Social

16   Security ("Commissioner") denying her applications for disability insurance benefits ("DI") under

17   Title II and for supplemental security income ("SSI") under Title XVI of the Social Security Act (42

18   U.S.C. § 301 *et seq.*) ("the Act").  The matter is before the Court on the parties' cross-briefs, which

19   were submitted without oral argument.  Following a review of the record and applicable law, the

20   Court reverses the Commissioner's determination to deny benefits and remands this action to the

21   Administrative Law Judge ("ALJ") for further consideration.

22

23                     I.  PROCEDURAL HISTORY AND FACTUAL BACKGROUND[1]

24       A.  *Procedural History*

25          Plaintiff applied for DI[2] on and for SSI on October 17, 2011.  AR 95-96.  She alleged

26

27   ─────────────────
     [1] The relevant facts herein are taken from the Administrative Record ("AR").
28   [2] Plaintiff's DI application states she also applied for benefits under Part A of Title XVIII of the Act.
     AR 193.  "Title XVIII of the Social Security Act (the "Medicare Act," 42 U.S.C. §§ 1395–1395ccc)

                                                    1

disability beginning on December 31, 2004.  AR 193.  The Commissioner denied the claims on

March 21, 2012, and upon reconsideration, on November 16, 2012.  AR 131, 140.  Plaintiff then

filed a timely request for a hearing.  AR 149.

Plaintiff appeared and testified before an ALJ, Thomas Cheffins, on August 14, 2013.  Also

at the hearing were Plaintiff's counsel and an impartial vocational expert, Scott Nielson.  AR 37.  In

a written decision dated August 27, 2013, the ALJ found Plaintiff was not disabled under Titles II

and XVI of the Act.  AR 31.  On March 28, 2014, the Appeals Council denied review of the ALJ's

decision,[3] which thus became the Commissioner's final decision.  AR 5, 1.  Plaintiff filed a timely

complaint.  Doc. 1.

B.  *Factual Background*

Plaintiff was born on January 5, 1966.  AR 399.  She was, at the time of the hearing, 47 years

old.  AR42.  Plaintiff claimed various medical conditions limited her ability to work.  These

included: bi-polar disorder, anxiety, panic attacks, and heart problems.  AR 246.

1.  Plaintiff's testimony

Plaintiff lived with two of her children, brother and sister in law.  AR 43.  She did not like

being around people, trusted only her kids, and socialized only with them.  AR 49, 55.  She testified

to hearing voices and not being able to deal "in a situation or cluster" and losing control.  AR 47.

When asked if her anxiety had gotten worse, Plaintiff replied, "[i]t started and I was 22 and now the

faces in the walls, and just all this stuff[.]"  AR 49.  She had trouble concentrating and would get

distracted.  For example, she would get sidetracked and go into a daze while trying to do the laundry.

Her cooking consisted of microwaving food, which she did for herself and her son.  AR 53.

Plaintiff testified she does not drink but has had wine.  She denied being a drug user but

provides a federal health insurance program for elderly and disabled persons. Medicare Part A covers inpatient hospital services and certain related benefits (Sections 1395c–1395i–4), and it is provided automatically for individuals entitled to Social Security retirement or disability benefits (Section 426)." *Beverly Cmty. Hosp. Ass'n v. Belshe*, 132 F.3d 1259, 1262 (9th Cir. 1997) (internal footnote omitted).

[3] On June 25, 2014, the Council again denied Plaintiff's request to reconsider its decision.  AR 1.

admitted to using marijuana, amphetamines and hallucinogens in her teens.  AR 56-57, 60.  When

questioned about her convictions for forgery and theft, Plaintiff stated they had been expunged and,

therefore, she had no criminal history.  AR 57.

Plaintiff received treatment from the Recovery Center for bipolar and post-traumatic stress

syndrome.  AR 51-52.  She constantly had flashbacks of painful events in her life (e.g., getting her

head pushed through a window, being raped).  AR 52.  She saw Dr. Ali Wahid for various conditions

including bipolar disorder, severe anxiety, and back and feet pain.  AR 58-59.

Plaintiff last worked in 2004 appraising damages to vehicles.  AR 44-46.  Since then, she

secured "a couple [*sic*] little positions" which did not last when the employers discovered she could

not read or write.  AR 47.  Plaintiff last sought work about four to five years ago (2008 or 2009).

AR 47.

Speaking on Plaintiff's behalf, her counsel asserted that Plaintiff met "Listing 12.04 or is

disabled within the framework of the grids at Step 5."  AR 41.  He stated that Plaintiff could not

sustain full-time work and that evidence from Plaintiff's treating physicians supported that

conclusion.  AR 41.

2.  Vocational expert testimony

Mr. Nielson, the vocational expert (VE), testified that based on Plaintiff's testimony and

work history report, her prior employment included being a cashier and finish inspector.  He

classified Plaintiff's jobs in the Dictionary of Occupational Titles (DOT) at code 211.462-010 for

cashier and code 741.687-010 for finish inspector.  AR 61.  Both positions had an SVP[4] of 2 and

required light exertion.  AR 61.

The ALJ posed a number of hypotheticals for the VE.  He first directed the VE to assume a

---

[4] "'SVP' refers to the 'specific vocational preparation' level which is defined in the DOT as 'the
amount of lapsed time required by a typical worker to learn the techniques, acquire the information,
and develop the facility needed for average performance in a specific job-worker situation.'
*Dictionary of Occupational Titles,* Appendix C, page 1009 (4th ed.1991)."  *Bray v. Comm'r of Soc.
Sec. Admin.* 554 F.3d 1219, 1230 (9th Cir. 2009).

person of the same age, education and work experience as Plaintiff, who was able to perform at all

exertional levels but was limited to simple, unskilled work with occasional: decision-making,

changes in the work setting, and interaction with the public and co-workers.  The VE opined that

such an individual would be able to perform the job of a finish inspector.  AR 62.  The ALJ then

directed the VE to assume the same person but with one change: interaction with co-workers and the

public was superficial.  The VE replied that the job of a finish inspector involves only superficial

contact.  AR 63.

Plaintiff's counsel also presented a hypothetical.  He asked the VE to assume a person who

had great difficulty with: regular attendance, consistent participation and working a normal workday

or work week.  AR 64.  The VE opined that such person would have a very difficult time

maintaining employment.  AR 66.

3.  Medical Evidence

a.  *Dr. Ali Wahid*

Dr. Ali Wahid was Plaintiff's primary physician.  AR 518.  He treated Plaintiff as early as

2009.  AR 497.  By April 30, 2012, he had prescribed to Plaintiff the following medications:

Phentermine (to counter Paxil and Abilify), Clonazepam (to treat severe anxiety), Lamotrigine (to

treat epilepsy), Metoprolol (to treat high blood pressure), Alprazolam (to treat anxiety and clinical

depression), Pro Air (to treat asthma), Abilify (to treat depression), Paxil (to treat depression), and

Soma (a muscle relaxer). [5]  Plaintiff alleged the medications caused various side effects such as

weight gain, extreme headaches, possible liver damage, suicide attempts, and oversleeping.  AR 299.

In an undated medications report, Plaintiff stated Dr. Wahid also prescribed Metoprolol for high

blood pressure, though she did not state when.  AR 363.

Dr. Wahid's treatment notes from February to September 2012 reflected varying results, as

---

[5] Plaintiff's niece completed a disability report on behalf of Plaintiff on April 30, 2012.  Therein, she
listed Plaintiff's medications, all of which were prescribed by Dr. Wahid.  AR 303, 299.

reported by Plaintiff: "ha[s] not gone to the hospital . . . panic attacks are much less, no

hallucination, or suicidal ideation . . . stopped Abilify because she ha[s] gained wt." (February 27,

2012); "weaned herself off [Abilify and Paxil because] wt gain is bothering her a lot . . . anxiety is

controlled," (March 16, 2012); "she is feeling more anxious and she is having more panic attack

since she stopped the [P]axil and [A]bilify . . . using [P]hentermine for weight loss.  She is not

suicidal, and she was not seen in the ER recently," (April 12, 2012); "was seen in the ER for panic

attack in the mall . . . using Phentermine, to lo[]se wt, and doing well on that," (April 30, 2012);

"contin[u]es to have anxiety, but she is cutting down her Xanax . . . using Klonopin . . . still having

panic attacks . . . denies suicidal or homicidal ideation" (June 4, 2012); "no panic attacks and she is

doing well.  She is very happy that she is weaning herself off Xanax," (September 13, 2012); "here

because of her back pain . . . had used her Soma and Aleve, but is not helping her pain" (September

27, 2012).  AR 554-562.  During the April 30 and June 4, 2012 visits, Dr. Wahid noted he had

advised Plaintiff to use Lamictal, but she did not comply.  AR 557-558.

　　　　On October 10, 2011, Dr. Wahid completed a Mental Residual Functional Capacity

Questionnaire ("2011 Questionnaire").[6]  Therein, he diagnosed Plaintiff with bipolar disorder,

general anxiety disorder and back pain.  AR 472.  He concluded that Plaintiff had mild limitations

with understanding and memory, generally moderate limitations with sustained concentration and

persistence, generally moderate limitations with social interaction, and zero to marked limitation

with regard to adaptation.  AR 475-476.  Plaintiff could not stay on task for longer than two hours

and would likely be absent from work for more than four days per month.  AR 476.  Her severe

anxiety and problem with concentration would cause difficulty with working a regular job.  AR 477.

　　　　On June 4, 2012, Dr. Wahid completed another questionnaire ("2012 Questionnaire")

addressing Plaintiff's physical and mental capacities.  Physically, Plaintiff could stand/walk and sit

---

[6] The ALJ correctly noted that the 2011 Questionnaire did not include Dr. Wahid's printed name, but the signature thereon appeared consistent with Dr. Wahid's signature on other medical documents. AR 479, 591-592.

no more than two hours a day.  Plaintiff had no restrictions with her hands and fingers, but is restricted in the use of her feet for repetitive movements due to chronic back pain and leg pain. After checking "yes" to indicate whether certain treatment and/or medications affected Plaintiff's ability to work, Dr. Wahid wrote "antipsychotic" and noted other limitations of "chronic back pain, & mental di[sorder]."  AR 590.  Regarding Plaintiff's mental capacities, Dr. Wahid noted: paranoia disorder and changes in mood.  He commented that Plaintiff had a "psychological problem."  AR 589.  He concluded Plaintiff had problems focusing, concentrating, following instructions, interacting with others, finishing tasks, and adapting to the work environment.  AR 591.

Dr. Wahid completed a third questionnaire on January 2, 2013, captioned Psychiatric Medical Source Statement ("2013 Questionnaire").  He concluded that Plaintiff had extreme limitations in the following areas: interacting with supervisors and co-workers, dealing with the public, maintaining concentration for two hour increments, withstanding the stress and pressures of an eight-hour work day, and understanding, remembering and carrying out an extensive variety of technical and/or complex job instructions.  She had marked limitations in the following area: understanding, remembering and carrying out simple job instructions and handling funds.  Dr. Wahid opined that Plaintiff's impairments were "severe [to] permanent."  AR 592.

### b.  *Dr. Philip Cushman*

Psychologist Philip Cushman examined Plaintiff on or before February 8, 2012 at the request of the Department of Social Services to evaluate her cognitive functioning.  AR 514.  He noted Plaintiff appeared well-groomed and walked with a normal gait, but had mild shuffling.  She was generally cooperative and agreeable, although "spacy."  AR 514.  He observed "significant underlying depression and rage." AR 515.

Plaintiff reported a history of outpatient psychiatric treatment at age seven which involved taking Ritalin for five years.  AR 515.  She had seen "hundreds of doctors over the years, usually at emergency rooms" due to frequent panic attacks beginning in her twenties.  AR 515.  She was, at the

time of the exam, receiving outpatient psychiatric treatment.  Though she had no reported history of

hallucinations or delusions, Dr. Cushman suspected she had episodes of dissociation.  "There was no

expressed suicidal or homicidal ideation" during the exam.  AR 515.  A review of Plaintiff's medical

information showed "chest discomfort that is unlikely cardiac in nature."  AR 515.  A brain scan

resulted in negative findings.  And a report from the Doctors Medical Center showed Plaintiff had an

accidental overdose and, therefore, was instructed to stop taking Soma, Clonazepam, and

Alprazolam.  AR 515.

Plaintiff reported trying alcohol and various drugs in her teens.  AR 517.  Growing up,

Plaintiff was sexually abused on several occasions by family and non-family members.  Her family

also abused her emotionally.  AR 517.  She believed her panic attacks worsened in her thirties.  AR

519.  She spent most of her time in the house lying in bed, usually sleeping.  She did not read or

listen to music.  Her chores involved cleaning her children's room to please her mom.  She did not

prepare meals for herself or others.  AR 518.

Dr. Cushman found Plaintiff "to be intellectually functioning in the mild mentally deficient

range.  Her verbal-ideational abilities fell in the mild mentally deficient range, while her visual-

motor abilities fell in the borderline mentally deficient range (FSIQ=63, VCI=68, PRI=75)."  AR

519.  Her performance suggested significant problems with verbal attention and concentration skills.

Further, "[t]he subtests that are most sensitive to problems with sustained attention and concentration

both fell in the mild mentally deficient range."  AR 519.  Plaintiff's reading and math computation

scores fell at a second grade level, her sentence comprehensions score fell at a third grade level, and

her spelling score fell at a first grade level.  AR 520.  In conclusion, Dr. Cushman found Plaintiff

incapable of performing any detailed or complex tasks, although capable of performing simple and

repetitive tasks in a work setting.  She would have great difficulty with regular attendance and

consistent participation, and with working a normal workday or work week.  She may need

repetitions when learning a new task, but appeared capable of following simple verbal instructions

from supervisors.  She would struggle to get along with supervisors, coworkers and the general public, and need help dealing with the stresses of a competitive work environment as she tended to over-personalize issues.  AR 521.

### c.  *Dr. Giagou*

Plaintiff began seeing Dr. Giagou in early 2013.  AR 646.  She received treatment from Dr. Giagou at least five times within a six-month period.  AR 620- 650.  In an undated medications report,[7] Plaintiff stated Dr. Giagou prescribed Risperidone (to treat schizophrenia), Clonazepam (to treat panic attacks), and Escitalopram (to treat depression).  She did not, however, state when he prescribed the medications.  AR 363.

On May 14, 2013, Dr. Nataliya Giagou filled out an Authorization to Release Medical Information form, wherein she indicated Plaintiff had a medically verifiable condition that would limit or prevent her from performing certain tasks.  Dr. Giagou noted the condition was chronic, assigned the onset date of February 7, 2013, and indicated Plaintiff was actively seeking treatment, but gave no explanation of the condition.  Dr. Giagou opined that Plaintiff could not work and had limitations which affected her ability to participate in education or training.  AR 600.

### d.  *Agency Medical Consultants*

At least two agency medical consultants evaluated Plaintiff's case.  On March 17, 2012, Dr. Helen Patterson opined that Plaintiff had no significant limitations in carrying out simple instructions, sustaining an ordinary routine without special supervision, and making simple work-related decisions.  Beyond these, her limitations were moderate.  Plaintiff had no significant limitations in accepting and responding to instructions from supervisors, getting along with coworkers, and maintaining socially appropriate behavior.  Overall, Plaintiff retained adequate mental capacity to sustain a normal workday and workweek, adequate capacity for appropriate social

---

[7] In an undated medications report, Plaintiff stated Dr. Navolanie prescribed Alaway (to treat an eye itch), Acyclovir (to treat herpes), Hydrocodine (to treat pain), and Soma (to treat pain).  She did not state when Dr. Navolanie prescribed the medications and their physician-patient relationship is unclear.  AR 363.

interactions with the public, supervisors and coworkers, and was capable of adapting to normal

changes within a work environment.  AR 78-79.  On November 6, 2012, another agency medical

consultant, Dr. G. Ikawada, made the same overall conclusions as Dr. Patterson about Plaintiff's

capacity to work, interact and adapt to changes within a work environment.  AR 108-110.

4.   Third Party Statements

a.   *Jennifer Teske*

Jennifer Teske, Plaintiff's best friend, completed a Third Party Function Report on December

11, 2011.  AR 260.  Ms. Teske stated she had known Plaintiff for ten years.  They would spend

fifteen to twenty hours either at Plaintiff's house or talking on the phone each week.  Because she

could not sleep at night, Plaintiff would call Ms. Teske at odd hours.   Plaintiff spent most of her day

inside and did not go places as she did not like crowds.  AR 253.  She kept herself locked up and saw

only her mother and children.  AR 258.  She took care of her children with the help of her mother.

She no longer maintained good hygiene, had to be asked or told to shower or brush her hair, and

wore the same clothes for several days.  AR 254-255.  She did not shop, cook, do house and yard

work, or handled money.  AR 255-256.  While she did not prefer to, Plaintiff went out a couple of

times a week.  AR 256.  She would go to the doctor and sometimes visit Ms. Teske, who picked up

Plaintiff three days per week.  AR 257.

In Ms. Teske's view, Plaintiff's conditions have existed her entire life.  AR 258.  They

affected Plaintiff's ability to lift, bend, stand, reach, walk, talk, see, memorize, complete tasks,

concentrate, understand, follow instructions, and get along with others.  AR 258.  She could stand

for no longer than thirty minutes, concentrate for no longer than twenty to twenty-five minutes and

could not finish what she started.  AR 258.  Plaintiff had the reading and writing ability of a second

grader.  AR 258.  She suffered panic and anxiety attacks constantly, and would end up in the

emergency room.  AR 259.  She felt safe only in her bedroom or with her doctor, and struggled to

tolerate her children.  AR 260.

b.   *Krista Burns*

Krista Burns, Plaintiff's stepdaughter, also completed a Third Party Function Report.  AR 316.  In the report, dated October 3, 2012, Ms. Burns stated she believed Plaintiff was mentally unstable and had a third grade learning level.  AR 316, 320.  Plaintiff could not interact with people, kept to herself and heard voices.  AR 316.  She stayed in her room all the time and appeared very depressed.  She cared for her children with the help of her mother.  She no longer cared about her appearance, took a bath once a week, ate one meal a day, and needed reminders to take her medication.  AR 317-318.  She no longer cooked or did any house and yard work because she could not remain focused or understand how to complete a task.  AR 318-319.  If encouraged, Plaintiff went out once a day with her mother or children.  AR 319.  She could not, however, go out alone because her severe anxiety caused her to feel as though everything is closing in on her and becomes scared.  She went to her doctor appointments every two to four weeks.  AR 320.  She could not drive because she felt scared, paranoid, would lose focus and has dozed off while driving.  She did not shop as she feared being in public places.  Her family members handled all of her needs and managed her money.  AR 319.  On good days, Plaintiff could spend as much as two hours with her children; although she seemed to wander off in her mind.  AR 320.

Plaintiff was moody: happy one minute and hostile the next.  She could walk about a quarter of a mile.  Her ability to follow spoken instructions varied from day to day.  AR 321.  She did not get along at all with authority figures and had been laid off or fired because she was hostile and suffered extreme anxiety attacks on the job, and her employer discovered that she could not read or write.  Plaintiff handled stress minimally, with medication, but became hostile and panicked with changes in routine.  AR 322.

c.   *E. Rocha*

Social Security employee, E. Rocha, interviewed Plaintiff face-to-face and completed a Disability Report on October 24, 2011.  AR 241-244.  Rocha described Plaintiff's behavior and

appearance as follows: Claimant "was having a little trouble concentrating and would wonder [*sic*] off just looking around in the office.  She was answering okay but had trouble remembering dates.  She was well groomed and nails and hair was done."  AR 244.

5.  ALJ's Decision

A claimant is disabled under Titled II and XVI if she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of no less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process which an ALJ must employ to evaluate an alleged disability.[8]

The ALJ here found that at step one, Plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 31, 2004.  At step two, Plaintiff had the following severe impairments: affective disorder, anxiety disorder, post-traumatic stress disorder, personality disorder, borderline intellectual functioning, and a history of substance abuse.  AR 24.  At step three, Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 25.  The ALJ found that

---

[8]  The ALJ must determine: "(1) whether the claimant is doing substantial gainful activity; (2) whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments that has lasted for more than 12 months; (3) whether the impairment meets or equals one of the listings in the regulations; (4) whether, given the claimant's residual functional capacity, the claimant can still do his or her past relevant work; and (5) whether the claimant can make an adjustment to other work."  *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (quotations, citations and footnote omitted); 20 C.F.R. §§ 404.1520; 416.920 (2011).  Residual functional capacity is "the most" a claimant "can still do despite [the claimant's] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a) (2011).  "The claimant carries the initial burden of proving a disability in steps one through four of the analysis.  However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Plaintiff's impairments did "not meet or medically equal the criteria listings of 12.02, 12.04, 12.06, 12.08, and 12.09" and explained the reasons why.  AR 25-26.

The ALJ concluded that Plaintiff had the residual functional capacity (RFC) to perform a full range of sedentary work at all exertional levels, but with some nonexertional limitations: simple, unskilled work with occasional decision making and changes in the work setting, and occasional interaction with the public and coworkers.  AR 26.  And at step four, Plaintiff was capable of performing past relevant work as a finish inspector because it did not require the performance of work-related activities precluded by her RFC.  AR 30.  Consequently, the ALJ concluded that Plaintiff was not disabled under Titles II and XVI.  AR 31.

## II.  DISCUSSION

A.  *Legal Standards*

This Court reviews the Commissioner's final decision to determine if the findings are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 401 (1971)), but "less than a preponderance." *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401. "If the evidence can reasonably support either affirming or reversing a decision, we may not substitute our judgment for that of the Commissioner.  However, we must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal citation and quotations omitted).  "If the evidence can support either outcome, the Commissioner's decision must be upheld."  *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003); *see* 42 U.S.C. § 405(g) (2010).  But even if supported by substantial evidence, a decision may be set aside for legal error. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

Nevertheless, an ALJ's error is harmless "when it was clear from the record that [the] error was inconsequential to the ultimate nondisability determination." *Robbins v. Soc. Sec. Admin.* 466 F.3d 880, 885 (9th Cir. 2006).

B. *Analysis*

Plaintiff alleges the ALJ failed to give legally adequate reasons for rejecting: the opinions of Drs. Wahid, Cushman, and Giagou; statements from Jennifer Teske, Krista Burns, and E. Rocha; and Plaintiff's subjective complaints. Opening Br. 12-26. The Court begins with Plaintiff's subjective complaints.

1. Subjective Complaints

Plaintiff avers the ALJ did not give specific, clear and convincing reasons for rejecting her testimony about disabling mental symptoms, including medication side effects. Opening Br. 25. The Commissioner asserts the ALJ properly rejected Plaintiff's subjective complaints by questioning her credibility and explaining that her complaints were inconsistent with objective medical evidence. Further, the ALJ specifically considered the medication side effects, which Plaintiff has not shown affected her ability to work. Opp'n 24-26.

Under Title II, a claimant's statement of pain or other symptoms is not conclusive evidence of disability. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529(a) (2010). "An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quotations omitted). "If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so. *Id.* at 1014-15; *Robbins,* 466 F.3d at 883 ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or

she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."); *Brown-Hunter v. Colvin*, --- F. 3d ---, 2015 WL 4620123 *5 (9th Cir. Aug. 4, 2015); SSR 96-7p (ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight.").  Factors an ALJ may consider include: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ must also give consideration to the factors enumerated in SSR 96-7p.[9] "It's not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not

---

[9] Social Security Ruling 96-7p states, in relevant part:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

1    credible.  He must either accept [claimant's] testimony or make specific findings rejecting it."

2    *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (citation and quotations omitted).

3         In this case, the ALJ found Plaintiff's medically determinable impairments could reasonably

4    be expected to cause the alleged symptoms.  AR 28.  Because no evidence suggested Plaintiff was

5    malingering, the ALJ was required to provide clear and convincing reasons for rejecting Plaintiff's

6    symptom testimony.

7         The ALJ expressly stated Plaintiff's "statements concerning the intensity, persistence and

8    limiting effects of [her] symptoms are not entirely credible" because of her "work history, treatment

9    record, and activities of daily living."  AR 28.   First, the ALJ explained that Plaintiff continued to

10   look for work approximately four years after the alleged onset date, which showed Plaintiff did not

11   believe she was disabled.  This is supported by Plaintiff's testimony and Work History Report.  AR

12   45, 276.  Second, the ALJ discussed Plaintiff's medical evidence and explained how they

13   undermined her alleged disability.  He noted a lack of medical evidence from 2002[10] to 2008[11] and a

14   series of missed medical appointments, which find substantial support in the record.  Third, the ALJ

15   noted contradictions with Plaintiff's testimony about her criminal past and drug use, both of which

16   she denied until presented with contrary evidence.  AR 56-57, 59-60.  These, too, are substantially

17   supported by the record, namely via Plaintiff's statements to Dr. Cushman and Dr. Giagou's

18   progress notes on February 7, 2013.  AR 517, 649.  Finally, the ALJ explained that Plaintiff's

19   function reports painted too restrictive a picture of her daily activities and noted examples which

20   showed otherwise.  He noted that Plaintiff cared for her children with the help of her mother, went to

---

[10] The earliest medical evidence appears to be a July 2, 2002 handwritten entry (mostly illegible) from a physician at the Stanislaus County Department of Mental Health, noting medications ordered for Plaintiff.  AR 610.
[11] On July 29, 2008, Dr. Richard Cercle completed a medical report for Plaintiff wherein he diagnosed her with sleep disorder, a history of panic attacks, and systolic heart murmur.  AR 384-386.

church,[12] microwaved food, and went shopping within six months of the hearing, all of which showed "some ability to concentrate and interact with others."  AR 29.  Again, substantial evidence supports the ALJ's findings.  AR 53-54.

With regard to the medication side effects, there are two different approaches in the Ninth Circuit regarding an ALJ's duty to consider them.  The first approach requires that an ALJ consider all factors that might have a significant impact on an individual's ability to work, including the medication side effects.  *Erickson v. Shalala*, 9 F.3d 813, 817-18 (9th Cir.1993) (citing *Varney v. Secretary of HHS*, 846 F.2d 581, 585 (9th Cir.1987) (superseded by statute on other grounds).  An ALJ may not reject a claimant's testimony as to subjective limitations of side effects without making specific findings similar to those required for excess pain testimony.  *Varney*, 846 F.2d at 585.  The second approach provides that in order for an ALJ's failure to discuss medication side effects to be error, the side effects must be a contributing factor in a claimant's inability to work.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1164 (9th Cir.2001) (no error in a question to a vocational expert that did not include information about side effects because "[t]here were passing mentions of the side effects of Mr. Osenbrock's medication in some of the medical records, but there was no evidence of side effects severe enough to interfere with Osenbrock's ability to work"); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (failure to expressly address medication side effects is not error where there was no record support for side effects); *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir.1985) (claimant had the burden of producing evidence that his use of prescription narcotics impaired his ability to work but failed to do so).

The Court finds no error under either approach.  First, the ALJ discussed Plaintiff's medication side effects, even if he did not list all of them, in reviewing her medical history.  AR 28.  He noted Plaintiff's medications included Meloxicam, Norco, Risperidone, Clonazepam, Xanax, and

---

[12] Despite the ALJ's characterization of Plaintiff's function reports as restrictive, evidence that Plaintiff cared for her children with the help of her mother and went to church appeared in her function reports and not from Plaintiff's testimony.  AR 265, 330, 268.

Klonopin.  AR 27.  But the ALJ's credibility determination, as discussed, led the ALJ to conclude as he did regarding Plaintiff's RFC.  Nonetheless, the record did not show how or if the medication side effects significantly impacted or contributed to Plaintiff's inability to work.  Plaintiff's subjective statements, notes from Drs. Wahid, Cushman, Giagou, and a nurse show, at most, that Plaintiff suffered medication side effects, but not that the side effects impaired Plaintiff's ability to work.  *See, e.g., Meanel v. Apfel,* 172 F.3d 1111 (9th Cir. 1999) (treating physician's note that "medications to control [claimant's] pain also causes [sic] decreased concentration skills. . . . falls short of an informed opinion that [claimant's] pain and diminished concentration skills would significantly interfere with her ability to work").

The ALJ therefore provided clear and convincing reasons for rejecting Plaintiff's symptoms.  *See Brown-Hunter*, 2015 WL 4620123 at *5-*6.

2.  Third Party Statements

Plaintiff contends the ALJ failed to give legally adequate reasons for rejecting statements from Ms. Teske, Ms. Burns, and E. Rocha.  Opening Br. 23-24.  The Commissioner asserts that any error committed regarding Mses. Teske and Burns was harmless because the ALJ's rationales for rejecting Plaintiff's subjective complaints apply equally to dismissing their statements.  Opp'n 27.  Additionally, the ALJ considered E. Rocha's statements and, nonetheless, such statements did not describe Plaintiff as being seriously disabled.  Opp'n 28.

"[C]ompetent lay witness testimony *cannot* be disregarded without comment[.]"  *Molina v. Astrue,* 674 F.3d 1104, 1114 (9th Cir. 2012) (quotations omitted).  Before discounting such testimony, "the ALJ must give reasons that are germane to each witness."  *Id.* (quotations omitted).  But the ALJ is not required to "discuss every witness's testimony on a[n] individualized, witness-by-witness basis.  Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness."  *Id.*

17

The ALJ gave "little weight" to observations about Plaintiff's "impairments and limitations" from Mses. Teske and Burns because their function reports "reflect[ed] inconsistencies." AR 30. Noting that Ms. Teske stated Plaintiff was able to care for her children and Ms. Burns stated Plaintiff did not cook, the ALJ implied that both statements were contrary to what Plaintiff actually did. AR 254, 318. Indeed, there is substantial evidence supporting the inconsistency with Ms. Burns's statement as it was contrary to Plaintiff's own testimony. AR 53. But no substantial evidence supports the inconsistency with Ms. Teske's statement as she did not state that Plaintiff cared for her children alone. Similar to Plaintiff's statement in her function report, Ms. Teske stated that Plaintiff cared for her children with her mother's help. AR 265. Nevertheless, any error here was harmless. The statements from both women were generally similar to those of Plaintiff's such that the evidence which discredited her statements and testimony could be used to discredit theirs. *Id.* at 1122 ("failure to comment upon lay witness testimony is harmless where the same evidence that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's] claims") (quotations omitted)).

With regard E. Rocha's statements, the Court finds Plaintiff's contention without merit. In the October 24, 2011, disability report, E. Rocha observed Plaintiff "having a little trouble concentrating and would wonder [*sic*] off just looking around the office" and had "trouble remembering dates." AR 243. Indeed, Social Security Ruling 96-7p provides, in relevant part: "the adjudicator must also consider any observations recorded by SSA personnel who previously interviewed the individual, whether in person or by telephone." SSR 96-7p. It does not, however, require the ALJ to explicitly discuss the observations. That the ALJ here stated he "considered the existing evidence and hearing testimony" shows he reviewed all of the evidence, including E. Rocha's statements. Moreover, assuming the ALJ erred, such error was harmless. *Robbins,* 466 F.3d at 885. First, a social security employee's observations or opinions is not an acceptable medical source and is not dispositive of a medically determinable impairment. SSR 06-3p; 20

C.F.R. § 416.913(c).  Second, there is no evidence that the contact between Plaintiff and E. Rocha

extended beyond one meeting such that the brief statements provided meaningful "insight into the

severity of the impairment(s) and how it affect[ed] [Plaintiff's] ability to function."  SSR 06-3p.

Finally, while E. Rocha's observations were consistent with Dr. Wahid's opinion regarding

Plaintiff's concentration, the ALJ effectively rejected Dr. Wahid's opinion, as discussed.

### 3.  Treating Physicians

Plaintiff avers the ALJ erroneously rejected the opinions of Drs. Giagou, Wahid, and

Cushman, all of whom treated Plaintiff, in favor the state agency physicians' opinions.  She contends

the ALJ gave neither clear and convincing nor specific and legitimate reasons.  Opening Br. 13.  The

Commissioner counters the ALJ gave reasonable explanations based on substantial evidence in

rejecting the treating physicians' opinions.  Opp'n 10.

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

(examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

physicians).  As a general rule, more weight should be given to the opinion of a treating source than

to the opinion of doctors who do not treat the claimant."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

1995) (footnote and citation omitted).  To reject a treating physician's opinion which is contradicted

by another physician, the ALJ must provide specific and legitimate reasons supported by substantial

evidence in the record.  *Id.*  (internal quotations omitted); *Turner v. Comm'r of Soc. Sec. Admin.*, 613

F.3d 1217, 1222 (9th Cir. 2010).  If the treating physician's opinion is not contradicted by another

physician, the ALJ must provide "clear and convincing" reasons supported by substantial evidence

in the record.  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  But an "ALJ need

not accept the opinion of any physician, including a treating physician, if that opinion is brief,

conclusory, and inadequately supported by clinical findings."  *Chaudhry v. Astrue*, 688 F.3d 661,

671 (9th Cir. 2012) (quotations and citation omitted).

a. *Dr. Wahid*

The ALJ gave little weight to Dr. Wahid's 2011 and 2013 Questionnaires, stating "they are inconsistent with the claimant's improvement on medication." AR 30. Otherwise stated, the ALJ believed Plaintiff's treatment record contradicted Dr. Wahid's opinions. The Court will determine whether the ALJ provide specific and legitimate reasons supported by substantial evidence because the findings of Drs. Patterson and Ikawada contradicted those of Dr. Wahid. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), as amended (Apr. 9, 1996) (stating the Commissioner must provide specific and legitimate reasons supported by substantial evidence in the record to reject a treating physician's opinion if it is contradicted by another physician's opinion .)

That Plaintiff's conditions improved was evident in the treatment notes from Dr. Wahid, which the ALJ expressly discussed. AR 28. For example, on February 27, 2012, Plaintiff reported she "ha[d] not gone to the hospital . . . panic attacks are much less, no hallucination, or suicidal ideation . . . [but] stopped Abilify because she ha[d] gained wt." AR 554. On March 16, 2012, Plaintiff's "anxiety [wa]s controlled," and on April 12, 2012, "[s]he [wa]s not suicidal, and she was not seen in the ER recently" although she felt more anxious and had more panic attacks since she stopped taking Paxil and Abilify. AR 555-556. By June 4, 2012, Plaintiff had gone to the ER for a panic attack at the mall and continued to have anxiety, but denied suicidal or homicidal ideation. AR 557-558. On September 13, 2012, Plaintiff reported "no panic attacks" and that she was "doing well." AR 560. But two weeks later, she reported having back pain getting no relief from Soma and Aleve. AR 562. Thus, while there were setbacks and undesirable medication side effects, the treatment notes showed Plaintiff making progress such that conditions improved.

Further, Dr. Wahid's 2011 Questionnaire is largely a check-the-box form, which is conclusory and devoid of analysis, as is his 2013 Questionnaire. Such forms are generally disfavored. *Cf.* 20 C.F.R. § 404.1527 (2011) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."). The ALJ therefore provided specific and

20

legitimate reasons for rejecting Dr. Wahid's opinion, apart from consideration of the state agency physician's opinions.

      b. *Dr. Cushman*

The ALJ did not reject all of Dr. Cushman's opinions, but gave little weight to the opinion that Plaintiff had great difficulty interacting with others and with attendance, because he believed Plaintiff "misrepresented her daily activities, thereby interfering with the doctor's opinion." AR 29. The ALJ specifically found Plaintiff's account of daily activities false and stated her "ability to attend to household chores for her children and maintain relationships with others undermine[d] statements she made to the examiner." AR 29. Again, the Court will determine whether the ALJ provide specific and legitimate reasons supported by substantial evidence where Drs. Patterson's and Ikawada's findings contradicted those of Dr. Cushman. *Lester v. Chater*, 81 F.3d 821, 830.

As reflected in Dr. Cushman's psychological evaluation, most of, if not all, of Plaintiff's history stemmed from her "reports" to him during the evaluation. Indeed, while Plaintiff told Dr. Cushman she spent most of her time in bed sleeping, cleaned her children's room to please her mom, and did not prepare meals, her statements in the function reports and at the hearing show otherwise. AR 53, 268, 333. Plaintiff testified to microwaving food for herself and her son. Socially, Plaintiff spent time with her mother and children, on top of spending fifteen to twenty hours per week with her best friend, Ms. Teske.

Furthermore, as discussed above, the ALJ found Plaintiff not entirely credible. *See Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir.1989) (concluding that physician's opinion may be disregarded if it is based on subjective complaints which were discredited). The ALJ therefore provided specific and legitimate reasons supported by substantial evidence, apart from consideration of the state agency physician's opinions.

c. *Dr. Giagou*

The ALJ gave "little to no weight" to Dr. Giagou's opinion that Plaintiff was "disabled and unable to work," noting that his completion of the Authorization to Release Medical Information form was "part of a public assistance determination, which uses a different standard than Social Security." AR 30. Other problems with the form were that it contradicted Plaintiff's alleged disability onset date, involved Dr. Giagou weighing "on an issue reserved to the [C]ommissioner," and conflicted with Dr. Giagou's own records. AR 30. The Court will determine whether the ALJ provide specific and legitimate reasons supported by substantial evidence because the findings of Drs. Patterson and Ikawada contradicted those of Dr. Wahid. *Lester v. Chater*, 81 F.3d 821, 830.

Some, but not all of the ALJ's reasons are substantially supported by the record. First, the ALJ correctly noted that the form was part of a different public assistance determination—in this case a state welfare program—distinct from Social Security. The Court thus agrees with the Commissioner's assertion that it is unknown the standard by which Dr. Giagou arrived at his opinion therein. Importantly, this is a legitimate reason for rejecting Dr. Giagou's opinion. Second, the ALJ correctly noted the conflicting disability onset dates. Dr. Giagou noted Plaintiff's condition was chronic and assigned the onset date of February 7, 2013, which was contrary to the alleged disability onset date of December 31, 2004. AR 600, 193. The conflicting dates naturally undermined, rather than buttressed, Plaintiff's claims.

Third, contrary to the ALJ's finding, Dr. Giagou did not opine on the form that Plaintiff was disabled, only that she could not work. To the extent that such opinion impinges on the ALJ's ultimate disability determination, it is a question reserved to the ALJ. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) ("The law reserves the disability determination to the Commissioner."). Finally, the ALJ's rationale that Dr. Giagou's opinions conflicted with his treatment records of Plaintiff is not supported by substantial evidence. The Commissioner points to treatments notes which showed an improvement in Plaintiff's conditions and notes examples where Plaintiff appeared

"calmer" and "happy with her kids."  AR 623.  But these treatment notes were made *after* Dr. Giagou completed the form.  Moreover, the examples were Plaintiff's subjective reports to Dr. Giagou rather than his assessment or that of the examining nurse.  AR 623-624, 626.

Nonetheless, the ALJ provided a specific and legitimate reasons, supported by substantial evidence, for rejecting Dr. Giagou's opinion.

4. Listing 12.05C

Finally, Plaintiff contends the ALJ erred in not considering, at step three, one of the listed impairments, intellectual disability, under 20 C.F.R. Part 404, Subpart P, Appendix 1, section 12.05. She asserts, specifically, that a finding of disability was warranted under section 12.05C.  Opening Br. 20-21.  The Commissioner counters that Plaintiff waived this issue by not raising it at the hearing and that she did not meet the criteria of Listing 12.05C.  Opp'n 18.

The Court notes Plaintiff did not explicitly raise Listing 12.05C at the hearing.  In *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999), the Ninth Circuit reiterated its position "that appellants must raise issues at their administrative hearings in order to preserve them on appeal."  There, the court rejected the plaintiff's contention that the waiver rule should not apply because disability benefits hearings are non-adversarial in nature and reasoned that the "fairness argument might be more persuasive if Meanel had not been represented by counsel. Yet she was represented by counsel who knew that all relevant evidence should have been brought to the ALJ's attention."  *Id.*  But *Meanel* involved evidence presented for the first time on appeal— evidence which the ALJ did not have the opportunity to consider.  *Id.*  The Ninth Circuit has, in fact, considered issues raised for the first time on appeal.  *Silveira v. Apfel*, 204 F.3d 1257, 1260 n. 8 (9th Cir. 2000) ("Vargas raised this argument for the first time on appeal. We nevertheless consider the issue because it is a pure question of law and the Commissioner will not be unfairly prejudiced by Vargas's failure to raise the issue below.  *See United States v. Thornburg,* 82 F.3d 886, 890 (9th Cir.1996) (stating that, despite general rule that arguments may not be raised for the first time on appeal, 'we will reach the question

23

1    if it is purely one of law and the opposing party will suffer no prejudice because of failure to raise it'

2    below).") And the Court does so here.

3           "If a claimant has an impairment or combination of impairments that meets or equals a

4    condition outlined in the 'Listing of Impairments,' then the claimant is presumed disabled at step

5    three, and the ALJ need not make any specific finding as to his or her ability to perform past relevant

6    work or any other jobs. 20 C.F.R. § 404.1520(d). An ALJ must evaluate the relevant evidence

7    before concluding that a claimant's impairments do not meet or equal a listed impairment. A

8    boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do

9    so. *See Marcia v. Sullivan,* 900 F.2d 172, 176 (9th Cir.1990) (holding that ALJ erred by failing to

10   consider evidence of equivalence)." *Lewis v. Apfel,* 236 F.3d 503, 512 (9th Cir. 2001). Here, the

11   ALJ discussed Listings "12.02, 12.04, 12.06, 12.08, and 12.09," but was silent as to Listing 12.05.

12   This was error.

13          " Listing 12.05C has three main components: (1) subaverage intellectual functioning with

14   deficits in adaptive functioning initially manifested before age 22 [i.e., the evidence demonstrates or

15   supports onset of the impairment before age 22]; (2) an IQ score of 60 to 70; and (3) a physical or

16   other mental impairment causing an additional and significant work-related limitation." *Kennedy v.*

17   *Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013); 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. The ALJ

18   had before him the following evidence: Plaintiff's twelfth-grade school record which reflected her

19   academic performance, her claim that she read at a third grade level, Dr. Cushman's test results

20   which showed Plaintiff's had an IQ at 63 and an academic achievement range between that of a first

21   and third grader, and statements from Mses. Teske and Ms. Burns regarding Plaintiff's intellectual

22   functioning. He found that Plaintiff suffered a number of severe mental impairments, among them—

23   borderline intellectual functioning. He also had before him testimony from Plaintiff that "[i]t started

24   when [she] was 22." Yet he failed to consider whether the impairment or combination thereof met

25   or equaled Listing 12.05C—intellectual disability. This was error.

If the ALJ found Plaintiff had an impairment or combination thereof which met or medically equaled an impairment listed in the Listing of Impairments, she would have been deemed disabled without further inquiry as to RFC and ability to perform past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) (2011).  Failure to consider Listing 12.05C was therefore not inconsequential to the ultimate nondisability determination and, consequently, not harmless.  *Robbins,* 466 F.3d at 885.

5.  Remand

"We have discretion to remand for further proceedings or to award benefits. If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded.  Where the Secretary is in a better position than this court to evaluate the evidence, remand is appropriate."  *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990) (citations and quotations omitted).  Under the circumstances, the Court finds remand appropriate.  *Id.*  ("We remand this case to the Secretary for proper consideration of step three equivalence because he is in a better position to evaluate the medical evidence."); *Brown-Hunter,* --- F. 3d ---, 2015 WL 4620123 *4 ("For highly fact intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency.") (quotations omitted).  If the Commissioner finds, on remand, that Plaintiff's impairment or combination thereof equals Listing 12.05C, she is presumed to be disabled, and benefits should be awarded.  If the Commissioner finds that Plaintiff's medical evidence fail to raise a presumption of disability, he should continue the disability evaluation to steps four and five.

III.  CONCLUSION

Accordingly, the Court GRANTS Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. This action is REMANDED to the Commissioner for further administrative proceedings consistent with this opinion. The Clerk of this Court shall enter judgment in favor of Plaintiff, Patricia Perry, and against the Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **September 23, 2015**                    **/s/ Sandra M. Snyder**
                                                    UNITED STATES MAGISTRATE JUDGE